MEMORANDUM OPINION




No. 04-07-00084-CV



Patricia ROMANO,


Appellant



v.



NEWELL RECYCLING OF SAN ANTONIO, LP and Sara Guerrero,

Appellees


From the Probate Court No. 2, Bexar County, Texas

Trial Court No. 2006-PC-1172

Honorable Tom Rickhoff, Judge Presiding


Opinion by: Steven C. Hilbig, Justice


Sitting: Karen Angelini, Justice

 Rebecca Simmons, Justice

 Steven C. Hilbig, Justice


Delivered and Filed: January 30, 2008


AFFIRMED

 The trial court was asked to determine which of two women, based on competing claims of
common law marriage, was the sole heir of Alejandro Flores Gonzales, Jr. Newell Recycling of San
Antonio, LP intervened based upon its interest in the outcome as Gonzales's employer at the time
of his death. The trial court concluded Sara Guerrero was Gonzales's common law wife and sole 


heir. Appellant Patricia Romano contends the evidence is insufficient to support the trial court's
judgment and claims she provided overwhelming evidence establishing she was Gonzales's common
law wife and therefore his sole heir. We affirm the trial court's judgment. 

Factual and Procedural Background

 According to Sara Guerrero, she began dating Gonzales in 1989 and they moved in together
in 1990. They continued to live together until Gonzales moved out in 1999. Patricia Romano
testified she met Gonzales in early 1998 and they lived together from July 1998 until Gonzales's
death in 2005. 

 On October 20, 2005, Gonzales died intestate. He was killed in an on-the-job accident at
Newell Recycling of San Antonio, LP. In 2006 Romano filed an application to determine heirship. 
Newell intervened because of potential litigation based on the incident in which Gonzales was killed. 
In its petition in intervention Newell pointed out that two women, Guerrero and Romano, were both
claiming informal marriages to Gonzales. 

 A trial was held in the probate court. Guerrero and Romano presented evidence they claimed
supported their common law marriages to Gonzales. At the conclusion of the trial, the court ruled
Guerrero's marriage to Gonzales was a valid, existing marriage, precluding any marriage to Romano. 
The trial court signed a judgment in which it found that while a marriage to both women could be
found based on the evidence, because Guerrero's marriage to Gonzales was never dissolved and
predated his alleged marriage to Romano, Guerrero was Gonzales's sole heir. Romano perfected an
appeal to this court. 

Applicable Law


Standard of Review

 Romano attacks the legal and factual sufficiency of the evidence supporting the finding of
a common law marriage between Guerrero and Gonzales. Romano timely requested findings of fact
and conclusions of law and filed a timely notice of past due findings and conclusions. See Tex. R.
Civ. P. 296, 297. The trial court failed to respond with any findings. However, Romano does not
complain about the absence of findings of fact and conclusions of law in her appeal. Accordingly,
we will review Romano's sufficiency complaints under the standard applicable when findings are
neither requested nor filed. See Gulf Coast State Bank v. Emenhiser, 562 S.W.2d 449, 452-53 (Tex.
1978) (holding that "grounds of error not asserted by points of error . . . are waived."). 

 In a nonjury trial, when no findings of fact or conclusions of law are requested or filed, we
imply all necessary findings in support of the trial court's judgment. Holt Atherton Indus., Inc. v.
Heine, 835 S.W.2d 80, 83 (Tex. 1992); Castano v. Wells Fargo Bank, N.A., 82 S.W.3d 40, 42 (Tex.
App.-San Antonio 2002, no pet.). When a reporter's record is included in the record, the implied
findings may be challenged for legal and factual insufficiency the same as jury findings or a trial
court's findings of fact. BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002);
Castano, 82 S.W.3d at 42. In a legal sufficiency review, "[w]e review the evidence in the light most
favorable to the verdict, disregarding all contrary evidence that a reasonable jury could have
disbelieved." Ysleta Ind. Sch. Dist. v. Monarrez, 177 S.W.3d 915, 917 (Tex. 2005); see City of
Keller v. Wilson, 168 S.W.3d 802, 812, 822 (Tex. 2005). In reviewing factual sufficiency, we weigh
all the evidence and set aside the finding only if it is so against the great weight and preponderance
of the evidence that it is clearly wrong and unjust. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242
(Tex. 2001). In the absence of findings, we must affirm the judgment on any theory of law supported
by the evidence. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990); Castano, 82 S.W.3d at 43. Substantive Law

Elements of Common Law Marriage

 "Common law marriages have been recognized in Texas since 1847." (1) Russell v. Russell,
865 S.W.2d 929, 931 (Tex. 1993) (citing Tarpley v. Poage's Adm'r, 2 Tex. 139, 149 (1847)). A
common law marriage has three requirements: (1) the parties agreed to be married; (2) the parties
lived together as husband and wife after they agreed to be married; and (3) the parties represented
to others that they were married. Tex. Fam. Code Ann. § 2.401(a)(2) (Vernon 2006); Russell, 865
S.W.2d at 932; Palacios v. Robbins, No. 04-02-00338-CV, 2003 WL 21502371, *3 (Tex. App.-San
Antonio Jul. 2, 2003, pet. denied) (mem. op.). All three elements must exist at the same time. 
Palacios, 2003 WL 21502371, at *3. 

 To establish an agreement to be married, "the evidence must show the parties intended to
have a present, immediate, and permanent marital relationship and that they did in fact agree to be
husband and wife." Eris v. Phares, 39 S.W.3d 708, 714 (Tex. App.-Houston [1st Dist.] 2001, pet.
denied). The agreement to be married may be established by direct or circumstantial evidence. 
Russell, 865 S.W.2d at 933. The testimony of one of the parties to the marriage constitutes direct
evidence the parties agreed to be married. See Eris, 39 S.W.3d at 714 (citing Collora v. Navarro,
574 S.W.2d 65, 70 (Tex. 1978)); In re Estate of Giessel, 734 S.W.2d 27, 32 (Tex. App.-Houston [1st
Dist.] 1987, writ ref'd n.r.e.). The conduct of the parties and evidence of cohabitation and
representations to others may constitute circumstantial evidence of an agreement depending upon
the facts of the case. See Russell, 865 S.W.2d at 933; Eris, 39 S.W.3d at 714. 

 Cohabitation need not be continuous. See Bolash v. Heid, 733 S.W.2d 698, 699 (Tex.
App.-San Antonio 1987, no writ) (holding evidence sufficient to establish cohabitation where
husband worked in Nigeria but lived with wife each time he returned to Texas). As with all of the
elements of common law marriage, cohabitation is determined on a case-by-case basis. See Estate
of Claveria v. Claveria, 615 S.W.2d 164, 166 (Tex. 1981). 

 The statutory requirement of "represent[ing] to others" is synonymous with the judicial
requirement of "holding out to the public." Compare Tex. Fam. Code Ann. § 2.401(a)(2) (Vernon
2006) with Claveria, 615 S.W.2d at 166. "'Holding out'" may be established by the conduct and
actions of the parties." Eris , 39 S.W.3d at 715. "Spoken words are not necessary to establish
representation as husband and wife." Id. Written references to the marriage or to a party as "spouse"
are evidence of "holding out." See Claveria, 615 S.W.2d at 167 (holding recorded deed in which
parties represented they were married was evidence of common law marriage); Persons v. Persons,
666 S.W.2d 560, 563 (Tex. App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (holding reference to
one party as "spouse" in credit application was evidence of holding out). Presumptions Affecting Common Law Marriage

 In this matter, there are two applicable presumptions. The first goes to the very existence of
a common law marriage while the second concerns validity of later marriages. See Tex. Fam. Code
Ann. §§ 1.102, 2.401(b) (Vernon 2006). 

 Section 2.401 provides that if no proceeding to establish the existence of a common law
marriage is "commenced before the second anniversary of the date on which the parties separated
and ceased living together, it is rebuttably presumed" there was no agreement to be married. Tex.
Fam. Code Ann. § 2.401(b) (Vernon 2006). The lapse of time does not bar suit but creates a
rebuttable presumption that the couple did not enter into any marriage agreement. Wilson ex rel.
C.M.W. v. Estate of Williams, 99 S.W.3d 640, 644 (Tex. App.-Waco 2003, no pet). 

 The second applicable presumption states, "[w]hen two or more marriages of a person to
different spouses are alleged, the most recent marriage is presumed to be valid as against each
marriage that precedes the most recent marriage until one who asserts the validity of a prior marriage
proves the validity of the prior marriage." Tex. Fam. Code Ann. § 1.102 (Vernon 2006). While
this presumption is "one of the strongest . . . known to law," the presumption can be rebutted if the
party with burden of proof establishes the existence of a valid prior marriage and negates its
dissolution. Bailey-Mason v. Mason, 122 S.W.3d 894, 898 (Tex. App.-Dallas 2003, pet. denied). 
This does not have to be established "absolutely or to a moral certainty." Id. Once evidence is
presented to show the prior marriage was not dissolved, it is up to the fact finder to determine
whether the presumption has been overcome. Id. If sufficient evidence is presented to establish the
prior marriage and its continuing validity, any subsequent marriage is void. See Tex. Fam. Code
Ann. § 6.202(a) (Vernon 2006). This rule rendering the subsequent marriage void applies whether
the marriage is ceremonial or common law. See, e.g., Foix v. Jordan, 421 S.W.2d 481, 485 (Tex.
App.-El Paso 1967, writ ref'd n.r.e.); Barker v. Lee, 337 S.W.2d 637, 639 (Tex. Civ. App.-Eastland
1960, no writ).

 Texas law recognizes common law marriage, but does not recognize common law divorce
or annulment. Claveria, 615 S.W.2d at 167; Ulloa v. Davila, 860 S.W.2d 202, 203 (Tex. App.-San
Antonio 1993, no writ). Accordingly, a common law marriage, like a ceremonial marriage, can
terminate only by death, divorce, or court-ordered annulment. Claveria, 615 S.W.2d at 167. In
proving the continued validity of the prior marriage, it is unnecessary to prove the absence of divorce
or annulment in every jurisdiction where such a proceeding was possible, but only where the parties
might reasonably have been expected to pursue them. Davis v. Davis, 521 S.W.2d 603, 605 (Tex.
1975). Proof that a prior marriage was not terminated by a court decree overcomes any presumption
that a later marriage is valid. Phillips v. Dow Chem. Co., 186 S.W.3d 121, 127 (Tex. App.-Houston
[1st Dist.] 2005, no pet.) (citing Villegas v. Griffin Indus., 975 S.W.2d 745, 750 (Tex. App.-Corpus
Christi 1998, pet. denied)). 

Analysis

 It is undisputed that Guerrero is subject to the presumptions described above. Accordingly,
for the court to find Guerrero was Gonzales's sole heir, the evidence had to prove Guerrero's
marriage to Gonzales was valid and existing during the time Romano and Gonzalez were purportedly
married. (2) On appeal, the question is whether there was legally and factually sufficient evidence to
permit the trial court to find (1) Guerrero and Gonzales were informally married prior to any
marriage between Romano and Gonzales, and if so, (2) that the Guerrero-Gonzales marriage was
never dissolved. 

Agreement

 Guerrero and Gonzales met in 1989. They dated until 1990 when they moved into a home
rented, and later owned, by Guerrero. Guerrero testified that after a month or two of cohabitation
she and Gonzales began referring to themselves as husband and wife. When asked how this came
about Guerrero stated that at dinner one night they began talking about "what we were going to do
since we're living together." At that dinner "both agreed . . . to live like husband and wife . . . be
a married couple . . . both agreed." She testified she considered him her husband and he considered
her his wife. Gonzales referred to Guerrero in her presence as "[m]y wife." This testimony, if
unchallenged, was legally and factually sufficient to establish an agreement to be married. See Eris,
39 S.W.3d at 714 (citing Collora, 574 S.W.2d at 70); Giessel, 734 S.W.2d at 32. 

 Romano claims this evidence is insufficient because it is self-serving and is contradicted by
other evidence in the record. Romano points to documents signed by Guerrero including a loan
application, a Deed of Trust, and a Non-Beneficiary Affidavit. The loan application and Deed of
Trust to which Romano refers were related to Guerrero's home purchase. These documents, which
were signed in 1997, describe Guerrero as single. Guerrero explained she signed the Deed of Trust
and other closing documents without reading them. Guerrero also completed a Non-Beneficiary
Affidavit to obtain insurance proceeds following Gonzales's death." The form affidavit contained
a question concerning whether Gonzales was married at the time of his death and Guerrero wrote
"NOT TO MY KNOWLEDGE." Guerrero explained she believed the question was asking if
Gonzales was married to someone else. 

 Guerrero's representations in these documents, and other items referenced by Romano, go
to the weight to be afforded the evidence. They do not negate a common law marriage. See Giessel,
734 S.W.2d at 31. As the trier of fact, it was the trial court's province to weigh the evidence and
resolve any conflicts, and we must assume it resolved all evidentiary conflicts in accordance with
its decision if a reasonable human being could have done so. See City of Keller, 168 S.W.3d at 820
(legal sufficiency); Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (factual
sufficiency). The trial court obviously resolved these conflicts in favor of a finding of a common
law marriage between Guerrero and Gonzales. 

Cohabitation

 There was extensive evidence of cohabitation. Omar Gonzales ("Omar") was Gonzales's
best friend and knew him more than twenty years. Omar testified Guerrero and Gonzales "lived
together . . . seven years, eight years, nine years, somewhere around there." Guerrero testified she
and Gonzales lived together from 1990 until he left the home in June or July of 1999. This is in
conflict with Romano's testimony because Romano claimed she and Gonzales moved in together
in July of 1998. Several of Guerrero's witnesses testified to cohabitation. Laura Prado testified
Gonzales and Guerrero lived together. Prado met the couple through a "pool" league and saw them
every week from 1990 to 1993 or 1994. A neighbor, Teresa Munoz Garrett, testified Gonzales
moved into Guerrero's house in 1990 and he was there "until later part of the 90s" and then gradually
she did not see him anymore. Gloria Castilleja, Gonzales's aunt, also testified Guerrero and
Gonzales lived together. 

 There was evidence that during Guerrero's cohabitation with Gonzales he sometimes left the
home and would stay with a friend or a relative. However, but for Romano's testimony that
Gonzales lived with her continuously from July of 1998, it does not appear that he left Guerrero for
more than a month or two at a time and that he left only during times the couple was fighting. Brief
absences from the marital home do not preclude a finding of cohabitation. See Bolash, 733 S.W.2d
at 699. 



Holding Out

 The record is replete with evidence that Guerrero and Gonzales represented to others that
they were husband and wife. It was established by their statements, their conduct, and written
references. Guerrero testified they considered each other husband and wife and that he referred to
her as his wife. She stated Gonzales introduced her to his friends as his wife and referred to her as
his wife in front of her friends. Likewise, Guerrero referred to Gonzales as her husband, not her
boyfriend. These references and introductions started when they moved in together in 1990. 

 Prado testified the couple always introduced themselves as husband and wife. Prado stated
that at league events the couple always said "this is my husband and this is my wife." Prado believed
they were married. Garrett testified Gonzales referred to Guerrero as "[h]is wife" and Guerrero
referred to him as "the husband." She said she always viewed them as husband and wife. Garrett
described how Gonzales would come to her house and visit her father. Garrett would hear Gonzales
say to her father, "well, . . . I got to go pick up my wife." (italics in the original) Similarly, Guerrero
would say to her at the conclusion of a visit, "I got to go -- time to go make dinner for my husband." 
(italics in the original)

 Gonzales's aunt, Castilleja, testified Guerrero "became part of the household, . . . always with
us." She said Gonzales called Guerrero "mi vieja," which she interpreted as meaning wife in
Spanish. There was no doubt in her mind they were married. Guerrero and Gonzales were sponsors
for the 1994 wedding of Castilleja's daughter. Guerrero was even invited to be part of the wedding. 
Both Guerrero and Gonzales signed the wedding guest book as "Mr. and Mrs. Alex Gonzales." 
Guerrero testified she signed on the right side of the book and Gonzales signed on the left side. She
identified the writing on the left as Gonzales's. The duplication apparently occurred because a child
at the wedding was taking the book around asking everyone to sign. 

 There were documents naming Guerrero as Gonzales's common law wife. Gonzales
completed two separate life insurance applications in 1992 naming Guerrero as his first beneficiary
and describing his relationship with her as common law wife. In 1997, he completed and signed a
life insurance policy modification giving ownership of one of the policies to Guerrero. 

 We recognize there were conflicts in the evidence with regard to "holding out." Omar
testified Gonzales never mentioned to him that he and Guerrero were married. He stated Gonzales
only referred to Guerrero as his girlfriend; however, he also claimed Gonzales referred to both
Guerrero and Romano as "ruca," which he claimed was Spanish slang for "girlfriend." Guerrero
signed documents designating her status as "single." Guerrero and Gonzales never filed joint tax
returns and had no joint bank accounts or credit cards. Gonzales's cousin, Irene De Leon, claimed
Gonzales only "dated" Guerrero and he never brought her to any family events. She admitted,
however, she was not close to Gonzales during the time he was with Guerrero. 

 Again, these conflicts do not preclude a finding that a common law marriage existed between
Guerrero and Gonzales, rather the conflicts go to the weight of the evidence and were for the trial
court to resolve. See Giessel, 734 S.W.2d at 31; City of Keller, 168 S.W.3d at 820 (legal
sufficiency); Golden Eagle Archery, 116 S.W.3d at 761 (factual sufficiency). We find sufficient
evidence to support a finding that Guerrero and Gonzales represented to others that they were
married. 

Absence of Dissolution

 The only remaining issue is whether the evidence supports the trial court's finding that the
Guerrero-Gonzales marriage was never dissolved. Guerrero testified they never divorced and they
were still married when he died. Gonzales's aunt, Castilleja, testified Gonzales lived in San Antonio
his entire life. Thus, San Antonio (Bexar County) was the only jurisdiction where a divorce or
annulment proceeding might reasonably have been pursued by Gonzales. See Davis, 521 S.W.2d
at 605. The record contains certificates from the Bexar County District and County Clerks certifying
there have been no divorce or other judgments involving Sara Guerrero in the court records of Bexar
County. Romano does not contest the sufficiency of proof concerning the absence of a divorce or
court-ordered annulment. We find the evidence is legally and factually sufficient to support the trial
court's implied finding that the common law marriage between Guerrero and Gonzales was never
legally dissolved. Conclusion

 We hold the evidence was legally and factually sufficient to support the trial court's findings
of a valid, undissolved common law marriage between Guerrero and Gonzales, precluding any later
marriage to Romano. Accordingly, we overrule Romano's issues and affirm the trial court's
judgment. 


 Steven C. Hilbig, Justice



1. "Informal marriage" is the statutory term used to describe what is colloquially known as a common law
marriage. See Tex. Fam. Code Ann. § 2.401 (Vernon 2006). 
2. Romano contends Guerrero had to rebut the presumption in section 2.401(b) and negate the existence of the
Romano-Gonzales common law marriage. We disagree. To prevail, Guerrero was required to prove her prior marriage
to Gonzales was valid and never legally dissolved, not that Romano's marriage to Gonzales was invalid. See Tex. Fam.
Code Ann. §§ 1.102, 2.401(b) (Vernon 2006). If sufficient evidence established an undissolved informal marriage
between Guerrero and Gonzalez, any informal marriage between Romano and Gonzales was void. See id. § 6.202(a).